UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DTC HEALTH, INC, § | |
| § | |
| Plaintiff, § | |
| v. § | CIVIL ACTION NO. H-06-01364 |
| § | |
| GLOBAL HEALING CENTER, INC, *et al*, § § § | |
| Defendant. § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant Global Healing Center's Motion to Stay Proceedings and Compel Arbitration (Doc. # 5). For the reasons set forth below, the motion is **DENIED**.

**I. Background**

At issue in this case is the arbitrability of a dispute between Defendant Global Healing Center, Inc. ("GHC") and Plaintiff DTC Health, Inc. ("DTC") before the American Arbitration Association ("AAA"). The dispute underlying the arbitration involves GHC's claims that DTC misappropriated its trade secrets and, using the trade secrets, developed and marketed products that directly compete with those of GHC.

GHC is an online retailer of natural health products. In 2004, GHC entered a consulting agreement with Virante, Inc. ("Virante") and its owner, Ryan Allis ("Allis"), for internet marketing services. The consulting agreement, which was signed by GHC and Allis on behalf of Virante, provided that all disputes arising out of the contract would be submitted to binding arbitration. DTC was not a party or signatory to the consulting agreement. In December 2005, GHC filed an arbitration demand and complaint with the AAA, against Virante, Allis, and DTC. GHC alleged that Allis controlled and performed services for DTC, a competing retailer of

1

health products, and that Allis had used DTC as an instrumentality to secretly breach the non-competition provisions between GHC and Virante. Specifically, GHC alleged that Allis misappropriated GHC's trade secrets and provided them to DTC, from which DTC derived competing products.

DTC objected to the jurisdiction of the arbitral tribunal, asserting that DTC was not a signatory to the arbitration agreement, nor had DTC ever had any relationship with GHC, Virante, or Allis. DTC requested that the arbitral tribunal dismiss all claims against it. Following a hearing on January 4, 2006, the arbitrator found that it was premature to dismiss DTC from the arbitration proceeding without GHC's having the opportunity to conduct reasonable discovery into agency, alter ego, and equitable estoppel theories with respect to DTC, Virante, and Allis, and that GHC should be permitted to conduct such discovery. Following this decision, DTC filed the instant suit in North Carolina state court, seeking a temporary restraining order and preliminary injunction of the arbitration proceedings, and moving to stay the arbitration. GHC removed the action to federal court and moved to transfer venue, upon which the action was transferred to this Court.

GHC has now moved the Court to stay all proceedings in this action and to compel arbitration. GHC also requests the Court to permit it to conduct discovery directed at the issue of the arbitration tribunal's jurisdiction over DTC, and to compel DTC to participate in the pending arbitration proceeding. GHC asserts that the determination of arbitral jurisdiction over DTC is properly made by the arbitral tribunal itself. Conversely, DTC contends that this Court should resolve the issue of the arbitration tribunal's jurisdiction over DTC, and that there is no evidence of any connection between DTC and Virante or Allis to support arbitral jurisdiction over DTC, or to warrant GHC's requested discovery into agency, alter ego, and equitable estoppel theories. The Court held a hearing on GHC's Motion to Stay Proceedings and Compel Arbitration on June

27, 2006. Having considered the parties' briefs and oral arguments, the Court finds that the determination of arbitral jurisdiction over DTC rests not with the arbitral tribunal, but instead with the Court. In light of the paucity of evidence suggesting any connection between DTC and Virante or Allis, no jurisdictional discovery is warranted, and the arbitral tribunal lacks jurisdiction to hear GHC's claims against DTC.

**II. Authority to Determine Arbitral Tribunal's Jurisdiction over DTC**

Both parties rely on the Supreme Court's decision in *First Options of Chicago, Inc. v. Kaplan* as authority on whether the determination of arbitral jurisdiction over DTC rests with the arbitral tribunal itself, or with the Court. 514 U.S. 938 (1995). In *First Options*, the Court held that the question of who should have the power to determine arbitrability depends on whether the parties involved agreed to submit the question to the arbitrator:

> We believe the answer to the "who" question . . . is fairly simple. Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute . . . so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter. Did the parties agree to submit the arbitrability question itself to arbitration? . . . [If] the parties did *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently.

514 U.S. at 943 (internal citations omitted). Moreover, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* at 944 (internal quotation omitted). Any uncertainty or silence as to the question of who should decide arbitrability must be decided against arbitration. *Id.* at 944-45.

Here, GHC argues that the parties agreed to submit the question of arbitrability to the arbitral tribunal, by incorporating the AAA Commercial Arbitration Rules into their consulting agreement. GHC accurately notes that the GHC-Virante consulting agreement provides for arbitration to proceed in accordance with the AAA Commercial Arbitration Rules. GHC is also correct that these rules provide that the arbitrator shall have the power to rule on his or her own

3

jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement. What GHC fails adequately to consider, however, is that DTC – the party contesting arbitral jurisdiction – was not a party to the GHC-Virante consulting agreement, and thus, never consented to the application of the AAA Commercial Arbitration Rules, or to arbitral jurisdiction being decided by the arbitrator.

This case is factually very similar to *First Options*, which involved a dispute between a stock-clearing firm and a husband and wife, the Kaplans, as to whether the Kaplans were liable to the firm for a debt of an investment company that was wholly owned by the husband. 514 U.S. at 940. Although the husband's investment company was a party to a contract with the firm, which contained an arbitration clause, the Kaplans had not personally signed the contract and denied that their dispute with the firm was arbitrable. *Id.* at 940-41. The Kaplans objected to the arbitrator's jurisdiction from the outset, filing written objections to that effect with the arbitration tribunal. *Id.* at 941. Finding that the Kaplans had not clearly consented to having the arbitrator decide the question of arbitrability, the Court held that the arbitrability of the dispute was subject to independent review by the courts. *Id.* at 946-47.

Likewise, in the case at issue here, DTC was not a party to any contract that provided for the question of arbitrability to be decided by the arbitration tribunal itself. Indeed, DTC's relationship to the contract in question is far more attenuated than was the Kaplans' to the contract in their case. Nor can DTC be said to have waived its right to independent court review, as DTC vehemently objected to arbitral jurisdiction throughout its submissions to the arbitrator. *First Options*, 514 U.S. at 946 ("[M]erely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue . . . insofar as the Kaplans were forcefully objecting to the arbitrators deciding their dispute with First Options, one naturally would think that they did *not* want the arbitrators to have binding authority over them."). It cannot be

concluded that DTC clearly and unmistakably agreed to submit the question of arbitrability to arbitration; rather, just the opposite seems to be true.  Accordingly, the Court has the independent authority to determine the arbitral tribunal's jurisdiction to arbitrate the dispute between GHC and DTC.

This conclusion comports with the findings of other courts that issues of arbitral jurisdiction are for courts to decide.  The Fifth Circuit has held that "a gateway dispute about whether the parties are bound by a given arbitration clause raises a question of arbitrability for a court to decide."  *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 217 (5th Cir. 2003) (internal quotation omitted).  The Texas Supreme Court has likewise held that, under the Federal Arbitration Act, "absent unmistakable evidence that the parties intended the contrary, it is the courts rather than the arbitrators that must decide 'gateway matters' such as whether a valid arbitration agreement exists.  Whether an arbitration agreement is binding on a nonparty is one of those gateway matters."  *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005) (citing *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003)).  Because DTC did not consent to submit the determination of arbitrability to arbitration, the issue of the arbitrator's jurisdiction over GHC's claims against DTC is such a gateway matter, to which the Court will now turn.

## III. Arbitral Tribunal's Jurisdiction over DTC

Generally, for a party to be subject to arbitral jurisdiction, the party must be a signatory to a contract containing an applicable arbitration clause.  *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 353 (5th Cir. 2003).  Nevertheless, the Fifth Circuit has recognized six theories under which a nonsignatory to an arbitration agreement may be held bound by that agreement:  (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and (6) third-party beneficiary.  *Id.* at 356.  Here, GHC contends that DTC should be equitably estopped from refusing to comply with the arbitration clause in the GHC-

5

Virante consulting agreement because DTC received a direct benefit from the agreement. GHC urges that the theory of equitable estoppel also applies in this case because a signatory to the consulting agreement (Allis) and a nonsignatory (DTC) colluded in the behavior giving rise to GHC's claims for breach of the agreement's non-competition covenants. GHC asserts that its claims against DTC are intertwined with the consulting agreement because DTC is the actual instrument Allis used to violate the agreement's covenants, and that its claims against DTC involve the same operative facts and are inseparable from the other claims that GHC has asserted in the arbitration. In addition to equitable estoppel, GHC argues that DTC should be compelled to arbitrate because an agency relationship exists between Allis and DTC, and because DTC is an alter ego of Allis.

To support these claims, GHC has presented a variety of evidence that, it contends, demonstrates a relationship between Allis and DTC. Specifically, GHC contends that:

> Allis owns Virante, Inc. and Broadwick, Corp. Aaron Hought[o]n is a shareholder in Broadwick, Corp. by and through his company, Preation, Inc. Tim Mertes ("Mertes") and Charles Andrew Stevens ("Stevens") own DTC. All the companies shared office space at 101 N. Columbia Street, Suit 400, and received reduced rents for their office space from Preation. Stevens has an equity interest in Broadwick Corp. Upon information and belief, Stevens has some interest in Preation, as he has a Preation email address he uses to register domain names for DTC. Allis performed extensive work on DTC's website. Mertes and Allis pledged the same fraternity and intimately socialize. Allis and Stevens also socialize.

> Although Allis testifies that Stevens did very little work for his company, an Internet search reveals that he performed an extensive amount of work for Broadwick Corp., participating in posting on literally hundreds of Internet forums on Broadwick's behalf. Furthermore, Aaron Houghton is not only Chief Technological Officer and on the board of directors for Allis'[s] company Broadwick, Inc., he also owns Preation, Inc. DTC shared office space with Preation, Virante and Broadwick. A Preation e-mail address was used to set up DTC's Internet website. Expert witness testimony offered in a deposition regarding a case with substantially the same facts revealed that Allis, in fact, performed extensive work on DTC's Internet website. Allis, Houghton, Stevens, and Mertes have mutual ownership interests and employment positions in the same companies.

GHC's Mot. at 13-14 (internal citations omitted).

The "case with substantially the same facts," to which GHC refers is *Activex America, Inc. v. DTC Health, Inc.*, which was filed in federal district court in North Carolina. GHC contends that the Activex lawsuit itself constitutes evidence of a close relationship between DTC and Allis, as well as evidence that DTC and Allis have engaged in the misappropriation of trade secrets in the past. According to GHC, the Activex lawsuit involved claims that, after Allis contracted to perform internet marketing services for Activex, DTC "coincidentally" created a competing product that was identical to Activex's "Syn-Flex" product. The Activex litigation resulted in a consent judgment and settlement, the terms of which are confidential. The filing of a similar lawsuit against DTC does not demonstrate a relationship between DTC and Allis. As DTC points out, neither Allis nor Virante were named as parties to the suit, nor were they addressed in the consent judgment. Moreover, Activex's allegations are insufficient to warrant compelling DTC to participate in an arbitration to which it did not consent.

GHC derives the other allegations set forth above, some of which are not entirely accurate,[1] from depositions that were taken in the Activex case. Even assuming these allegations to be true, they do not show a relationship between Allis and DTC, which would support any of GHC's theories for compelling DTC to arbitrate. While it is apparent that the owners of the companies named in GHC's allegations are acquaintances and have interacted on both professional and personal levels, this does not demonstrate a relationship specifically between Allis and DTC. Similarly, the fact that the various companies, including DTC and Virante, once

---

[1] For example, GHC claims that "Mertes and Allis pledged the same fraternity and intimately socialize," citing page 22, lines 20-24, of Allis's deposition in the Activex litigation. Rather than testifying to such "intimate socialization," Allis responded to a question about his relationship to Mertes as follows: "I wouldn't say 'a friendship.' We perhaps became associates or talked. But I don't know if we ever hung out, other than what was going on within the business fraternity pledging process." Allis Dep. 22:20-24, Apr. 22, 2005. Allis dropped out of the fraternity pledging process after three weeks. Allis Dep. 23:3-4. Additionally, GHC claims that Stevens must have had an interest in Preation because he had a Preation email address. It does not follow, however, that Stevens would have had any kind of ownership or other interest in Preation simply because he had such an email address.

7

shared office space in the same building does not show any connection between DTC and Allis. Of GHC's various allegations, the only direct link between DTC and Allis is the work that Allis performed on DTC's website in late 2003, prior to GHC's entering into the consulting agreement with Virante. Stevens Dep. 72:9-16, May 5, 2005. This work does not demonstrate an agency or alter ego relationship between DTC and Allis, nor does it support GHC's estoppel theory.

The Fifth Circuit has recognized both a "direct benefits" theory of equitable estoppel, as well as an "intertwined claims" theory. *Bridas*, 345 F.3d at 360-62. Here, GHC asserts both theories. With respect to its "direct benefits" theory, GHC contends that DTC received a direct benefit from the GHC-Virante consulting agreement in the form of GHC's trade secrets, and that DTC should therefore be estopped from refusing to comply with the agreement, including the arbitration clause. The Fifth Circuit has found an "important distinction," however, between cases in which direct benefits estoppel has been applied and cases in which it has not – "[i]n the former, the nonsignatory had brought suit against a signatory premised in part upon the agreement." *Bridas*, 345 F.3d at 362 (citing *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000)). In *Int'l Paper*, for example, a nonsignatory had derived the benefit of the contract containing the arbitration clause by filing suit and seeking damages for a signatory's alleged breach of that very contract. 206 F.3d at 418 ("[Plaintiff's] entire case hinges on its asserted rights under the . . . contract; it cannot seek to enforce those contractual rights and avoid the contract's requirement that 'any dispute arising out of' the contract be arbitrated."). Here, DTC has not filed any claims against GHC or any other party, arising out of the GHC-Virante consulting agreement or otherwise. Although GHC argues that DTC received the "direct benefit" of GHC's trade secrets, this contention is factually unsupported at this point in the case. Additionally, even if DTC obtained GHC's trade secrets through Virante and Allis, as GHC may later prove, this would not constitute a direct benefit

8

from the GHC-Virante consulting agreement itself. Because GHC has not shown that DTC received a direct benefit from the consulting agreement containing the arbitration clause, DTC will not, under this theory, be estopped from objecting to arbitral jurisdiction.

With respect to its "intertwined claims" theory of estoppel, GHC contends that Allis used DTC as an instrument for violating the non-competition covenants of the GHC-Virante consulting agreement, and that GHC's claims against DTC are therefore intertwined with its claims against Allis and with the consulting agreement itself. The Fifth Circuit has found that "application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000). In *Grigson*, however, the court applied equitable estoppel to allow the *nonsignatory* defendant to compel the *signatory* plaintiff to arbitrate. *Id.*; *see also Bridas*, 345 F.3d at 360 ("In *Grigson*, we estopped a *signatory* plaintiff from relying upon the defendants' status as a nonsignatory to prevent the *defendants* from compelling arbitration under the agreement."). The Fifth Circuit has explicitly held that the *Grigson* formulation of intertwined claims estoppel cannot be used by a signatory plaintiff to compel a nonsignatory defendant to participate in arbitration. *Bridas*, 345 F.3d at 361; *see also MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 62 (2nd Cir. 2001) ("[B]ecause arbitration is guided by contract principles, the reverse is not also true: a signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party."). Here, GHC, a signatory plaintiff, seeks to estop DTC, a nonsignatory defendant, from objecting to arbitration. Because the Fifth Circuit has rejected this application of intertwined claims estoppel, GHC is not entitled to compel DTC to participate in arbitration on this basis.

9

In addition to its equitable estoppel theories, GHC asserts that an agency relationship exists between Allis and DTC. Agency is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Bridas*, 345 F.3d at 357 (quoting Restatement (Second) of Agency § 1(1) (1958)). An agency relationship may be shown by "manifestations, written or spoken words or conduct, by the principal, communicated either to the agent (actual authority) or to the third party (apparent authority)." *Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 181 (5th Cir. 1989). As discussed above, GHC's allegations of a relationship between DTC and Allis are insufficient to show either that Allis acted as DTC's agent, or that DTC acted as Allis's agent. That Allis performed work on DTC's website, that Allis is a friend of the owners of DTC, and that DTC and a company owned by Allis once shared office space do not amount to the manifestation of actual or apparent authority needed for an agency relationship to arise. There is no evidence of an agency relationship between DTC and Allis, and DTC cannot be compelled to arbitration under an agency theory.

Finally, GHC contends that DTC is an alter ego of Allis. Under the alter ego doctrine, a corporation may be held liable for the acts of another corporation "when the subject corporation is organized or operated as a mere tool or business conduit." *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 593 (5th Cir. 1999). Alter ego is established "by evidence showing a blending of identities, or a blurring of lines of distinction, both formal and substantive, between two corporations," *Id.* (quotation omitted), or when "their conduct demonstrates a virtual abandonment of separateness." *Bridas*, 345 F.3d at 359 (quotation omitted). An alter ego may be held liable for the actions of its instrumentality only if (1) the owner exercised complete control over the subject corporation with respect to the transaction at issue, and (2) such control was used to commit a fraud or wrong. *Bridas*, 345 F.3d at 359. Just as there is insufficient

evidence of any agency relationship between DTC and Allis, there is no evidence that Allis or DTC exercised any kind of control over the other, nor that DTC's and Allis's identities blended in any way whatsoever. GHC has failed to demonstrate that DTC is or was Allis's alter ego.

GHC has fallen far short of the showing required to support any of its theories for asserting arbitral jurisdiction over DTC, and it would therefore be inappropriate to compel DTC to participate in arbitration under the arbitration clause of the GHC-Virante consulting agreement. In addition, GHC has failed to show how conducting discovery would allow it to substantiate any of these theories, or any other grounds for compelling DTC to arbitrate. Accordingly, the Court finds that further discovery is unwarranted, and GHC's claims against DTC are not subject to arbitral jurisdiction.

## IV. Conclusion

Defendant Global Healing Center's Motion to Stay Proceedings and Compel Arbitration is **DENIED**. Because the Court concludes that the arbitral tribunal does not have jurisdiction over DTC, a nonsignatory to the arbitration agreement, and that further discovery into DTC's connection to Allis or Virante by GHC is not warranted, the Court expects that the remaining motions in this action will be moot. A conference will be held later in the month to discuss the status of the case, on a date to be set by the Court.

**IT IS SO ORDERED**.

**SIGNED** this 17th day of July, 2006.

*[signature: Keith P. Ellison]*

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL
FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY
EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT